**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

FILED

SEP 0 9 2019

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| **(1) KEVIN ADAMS,** | |
| **Plaintiff,** | **Case No.** |
| **v.** | |
| **(1) JUDGE KURT GLASSCO;** | **19 CV   494 GKF - JFJ** |
| **(2) CATHERINE Z. WELSH;** | |
| **(3) WELSH & MCGOUGH, PLLC** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## COMPLAINT

Plaintiff, Kevin Adams (*pro se[1]*), (Plaintiff), brings this action under the First and Fourteenth Amendments to the United States Constitution, the *Oklahoma Religious Freedom Act* and common law fraud against Defendants, Judge Kurt Glassco (Judge Glassco), Catherine Z. Welsh (Welsh), and Welsh & McGough, PLLC. Plaintiff is seeking all relief that the law will allow.

### THE PARTIES

1. Plaintiff is a licensed attorney and an Oklahoma resident residing in Rogers County within the Northern District of Oklahoma.

2. Defendant, Judge Glassco, is an Oklahoma resident residing in Tulsa County and sitting Tulsa County District Court Judge for the Fourteenth (14th) Judicial District of Oklahoma.  It is alleged that Judge Glassco conspired with Welsh and Robyn Owens to deprive Plaintiff of his constitutional rights and $5,750.

---

[1] Plaintiff has chosen to initially file this complaint *pro se,* however will be represented once the litigation gets going.

3.   Defendant, Catherine Z Welsh, is a licensed attorney, a former Assistant General Counsel for the State of Oklahoma Department of Human Services, Adult Protection Services, and Oklahoma resident and believed to be residing in Tulsa County within the Northern District of Oklahoma. It is alleged that despite being a guardian that, normally does not act under the color of state law, Welsh was acting under color of law by conspiring with Judge Glassco and Robyn Owens to deprive Plaintiff of his constitutional rights. See Tower v. Glover, *467 U.S. 914* (1984).

4.   Welsh and McGough, PLLC, is a professional limited liability company formed by Catherine Welsh and James McGough. The firm was appointed as guardian over Plaintiff's father. Welsh and McGough, PLLC is only named in Count Eight, Common Law Fraud.

5.   Robyn Owens (Owens) was appointed the guardian ad litem in the R.A. guardianship case and is alleged by the Plaintiff to have conspired with Judge Glassco and Welsh to deprive Plaintiff of his constitutional rights. See Tower v. Glover, *467 U.S. 914* (1984). Despite Plaintiff's beliefs regarding Owens actions in this matter, Plaintiff has chosen not to name her as a party to this action.

**JURISDICTION AND VENUE**

6.   This action arises under the First and Fourteenth Amendments to the United States Constitution, under the Civil Rights Act, 42 U.S.C. Section 1983. More specifically, this Court is authorized to provide declaratory relief under the Declaratory Judgment Act, 28 U.S.C. Section 2201 through 2202.

7.   This Court has jurisdiction over the claims pursuant to 28 U.S.C. Sections 1331 and 1343. This Court has supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. Section 1367.

8.   Venue is proper in this Court pursuant to 28 U.S.C. section 1391(b)(2) by virtue of the fact that substantially all acts and omissions that form the basis for Plaintiff's claims occurred in the Northern District of Oklahoma.

## FACTS

9.   R.A. is the father of Plaintiff. R.A. is a 73-year-old combat Vietnam veteran and a retired steelworker. R.A. is a Christian and member of the View Acres Baptist Church in Tulsa, OK.

10.  On May 5, 2019 R.A. was admitted to St John's Medical Center in Tulsa Oklahoma.

11.  Plaintiff's father had no advanced directive in place.

12.  On June 9th at approximately 1:00 P.M. Plaintiff arrived at St John's Medical Center to visit his father. It was Plaintiff's intention to stay for a short period of time and return to church for the evening service.

13.  When Plaintiff arrived at the hospital his stepmother and sister were present, Plaintiff was surprised to see his stepmother at the hospital, because she typically does not visit his father on the weekends.

14.  When Plaintiff walked into room 1416, where his father was staying his step-mother was on the phone authorizing a DNR Order. (Do Not Resuscitate Order)

15.  Plaintiff was surprised by this order because it was his understanding that his father's heart had originally stopped and he was resuscitated.

16. Plaintiff's stepmother and sister left a shortly after calling in the DNR.

17. Plaintiff was very disturbed by this development and did not return to church for the evening service, as previously planned, and instead stayed at the hospital until the following morning.

18. That evening Plaintiff's father was in significant pain. Plaintiff asked for prayers of friends and his congregation.

19. At 6:49 pm on June 9, 2019 Plaintiff recorded a short video of his father. The video showed his father was in significant pain.

20. By 2:31 am on June 10th Plaintiff's father was resting comfortably crunching on ice and Plaintiff made another video.

21. At 2:40 am Plaintiff was so happy and grateful that Plaintiff  took a "selfie" with his father and Plaintiff posted the picture on Facebook thanking the nursing staff and the people that were praying for Plaintiff's father.

22. Later on on June 10th while eating lunch with the family Plaintiff received text message from his stepmother stating:

   "Kevin dad's Dr wants to take out all it's (sic) and stop all testing and put him on meds for comfort only, they cannot do anything medically to help him. Do you agree she would like to know within the hour. As you can tell by yesterday's visit he is suffering tremendously let me know or come to the hosp I'll be here for a while. Sorry I couldn't get you on the phone this is only # I had!"

23. Plaintiff stopped eating lunch and drove to the hospital immediately and Plaintiff's wife and daughters followed. Once Plaintiff arrived at the hospital there was a meeting held in the room with Plaintiff's father. (Plaintiff's wife and daughters had

4

arrived by the time of the meeting and Plaintiff's brother was included in the meeting on speaker phone.)

24.  During the meeting the family met with a female doctor who tried to convince Plaintiff to agree to stop medically treating his father.

25. During this meeting the doctor <u>admitted that Plaintiff's father would die if she engaged in the treatment plan she was proposing</u>. The reason the doctor gave for planned treatment was that she claimed she did not "think" or "believe" Plaintiff's father's mental capacity would return where he could have a "good quality of life".

26. Plaintiff explained he could not agree to what the doctor was proposing and that "we don't make those type of decisions". Plaintiff told the doctor it was not our decision to decide whether or not someone's life was worth living. Plaintiff believed what the doctor was suggesting would be euthanasia and is against his and his father's Christian faith.

27. The conversation ended when Plaintiff told the doctor "if you try that I will litigate."

28. After making that statement the doctor stormed out of the room, followed shortly by his stepmother.

29. Plaintiff's sister stayed for a brief period of time and then left as well.

30. Plaintiff falsely believed the issue had been resolved and that the threat of litigation would stop the hospital from attempting to euthanize his father. It was not until the next day that Plaintiff learned that the hospital was proceeding against Plaintiff's expressed disapproval and behind his back.

31. Despite the hospital's claims regarding Plaintiff's father's diminished mental capacity; on the morning of June 11th, 2019, the very morning the hospital would begin the procedure expected to end R.A.'s life, Plaintiff's father asked his sister (Plaintiff's Aunt Janice) if Plaintiff was returning to the hospital to read him the Bible. Plaintiff had been reading the Bible to his father for days and had not told members of his family.

32. Sometime before noon on June 11, 2019 Plaintiff learned the hospital was proceeding with procedure that would cause his father's death and immediately went to the hospital.   When Plaintiff the elevator doors opened on the fourteenth (14th) floor Plaintiff saw hospital staff pushing his father in his hospital bed over to the other side of the hospital floor to begin the procedure that they admitted would end his father's life. When Plaintiff  first saw his father being pushed over to the other side of the floor, Plaintiff's stepmother was walking behind his father carrying a paper.

33. Plaintiff confronted his stepmother about doing this without telling him and against his will. She stated she was doing what the doctors told her to do.

34. Plaintiff had read the hospital pamphlet left in his father's room and believed it to be very misleading based upon comparing what was said in the pamphlet to the answers the doctor gave in the June 10th meeting.

35. Plaintiff told his stepmother "I will return with a court order".

36. After the Plaintiff was appointed emergency guardian, over his father approximately two hours later, and had a certified copy of the order appointing him, Plaintiff

6

literally ran to his car, over a block away, because he was afraid his father would be dead by the time he arrived at the hospital.

37. On the way to the hospital Plaintiff called the hospital and spoke with the "charge nurse" on his father's floor. Plaintiff told the "charge nurse" he had been appointed emergency guardian over his father, was on his way to the hospital with a certified copy of the court order appointing him emergency guardian over his father and ordered the hospital to stop administering morphine or any other drug that would cause his father's death.

38. Upon arrival at the hospital , after giving the hospital a certified copy of the order appointing him, the hospital staff initially refused to take the Plaintiff to his father, or tell him which room his father was in.

39. Once Plaintiff was in the hospital room with his father the Plaintiff had to threaten to call the Tulsa County Sheriff's office to get the hospital to stop the  lethal injection of morphine.

40. After a meeting in which hospital staff pressured the Plaintiff to change his mind and allow them to continue with the procedure that would end his father's life, Plaintiff's father was moved from the 14th floor to the 8th floor.

41. Shortly after being moved to the eighth (8th) floor; Plaintiff's step-father, who is a minister, and Plaintiff's Pastor came to the hospital and they and the Plaintiff prayed for Plaintiff's father.

42. Plaintiff's step-mother and sister retained a lawyer and went to court in an attempt to obtain an order allowing R.A. the hospital to resume the procedure that would end his father's life.

43. On the afternoon or evening of June 11, 2019 the Judge Glassco was assigned to the guardianship case[2], the lawyers and the doctors visited Plaintiff's father in his room. The doctors told Judge Glassco that if they would have administered the full dosage of morphine they had planned that Plaintiff's father would not have made it through the night of   June the 11th. Doctors doubted whether the Plaintiff's father would make it through the night, even without the morphine injection they had planned.

44. The next morning after Plaintiff's father woke up he was calm, lucid and not in pain. Plaintiff took a video beginning at 9:07 am on June 12th 2019. In the video R.A. is calmly talking, giving the Plaintiff directions regarding his food, eating eggs, answering questions regarding food preferences and stated that he needed "about a gallon of that water." Sometime later R.A.'s doctors were shown this video but, they were unpersuaded.

45. On Friday June 14, 2019, during a hearing on R.A.'s guardianship, Judge Glassco announced his intentions to appoint Catherine Welsh guardian ad litem in the guardianship case of Plaintiff's father.

46. Judge Glassco spoke of Welsh in glowing terms talking about her past experience at the Oklahoma Department of Human Services as the head of Adult Protective Services.

---

[2] The emergency guardianship order was signed by Presiding Judge William J. Musseman

47. At that hearing Plaintiff hoping to bring unity to his family and trusting Judge Glassco's recommendation, Plaintiff agreed to resign as guardian and allow Catherine Welsh to be appointed as the guardian for his father. The change in guardianship was to take place the next week.

48. At the time Plaintiff agreed to resign and allow Catherine Welsh to be appointed as guardian over his father Plaintiff had no idea Ms. Welsh's views on euthanasia or how it would influence the decisions on his father's case.

49. Plaintiff would have never agreed to allow Welsh to be guardian over his father if he would have been aware of Welsh's euthanasia views and how her views would influence the decisions she made as guardian over his father.

50. On the afternoon of June 15th a meeting was held in the hospital room of R.A. at the St. John's Hospital. Present at the meeting was R.A., R.A.'s doctor (Doctor Carol), R.A.'s wife and daughter, Welsh and Plaintiff.

51. During the June 15th meeting Welsh and Dr. Carroll tried repeatedly to persuade Plaintiff to consent to withdrawing all medical treatment from R.A. and giving him morphine to keep him "comfortable" until his death.

52. Plaintiff was shocked because of the great improvements that could be seen in his father. Plaintiff reminded everyone of the video taken on June 12, 2019 (the day after Plaintiff, his step-father and pastor had prayed for R.A.) that showed the remarkable improvement in R.A.'s condition.

53. No matter what Plaintiff said, Doctor Carroll and Welsh argued Plaintiff should allow the hospital to give up on his father and drug him with morphine until he died. Plaintiff vehemently refused.

54. It was during this June 15th meeting that Plaintiff first became aware of Welsh's views on euthanasia, which Plaintiff believed was influencing her recommendations regarding the best course of action for his father.

55. Plaintiff believed then and now that allowing that the hospital to stop all life sustaining treatment for his father and drugging him with morphine until his father died was nothing short of euthanasia and was contrary to Plaintiff's father's faith and Plaintiff's own faith.

56. During the June 15th meeting Welsh told a story about a situation where she had given a wife similar advise regarding her husband and the wife had refused. Welsh complained that the husband had survived and "now he has the mentality of a 5-year-old kid", hearing Welsh's complaints and the way she expressed them, Plaintiff was horrified. Plaintiff was horrified and thought "we have a four-year-old daughter and we don't kill 5-year-old kids".

57. Welsh then proceeded to ask Plaintiff what was going to happen with his father and whether he was going to be placed in a home and whether his father would want to live out his remaining days in a nursing home. Welsh argued Plaintiff's father would not want to live out his remaining days in a nursing home. Plaintiff explained that his father could live with him and his family and that Plaintiff would give up his home office to make room for his father.

58. After Welsh's statements concerning whether his father would be placed in a home or not, Plaintiff was more convinced than ever that Welsh was advocating euthanasia for his father, because Plaintiff knew if there was no hope for his father, there would be no concern where Plaintiff's father would live after he left the hospital.

59. Plaintiff believes that Welsh's statements concerning where his father would live after he left the hospital revealed her true feeling regarding his father's right to life. Plaintiff believes that with this statements she revealed her true feelings that it wasn't that his father had to die, it was that Welsh had made the determination his life was not worth living. Welsh's statements were consistent with the reasoning the doctor had given in the June 10th 2019 meeting that they did not believe his father's mental state would return to the point of giving him a "good quality of life".

60. Welsh's statements reinforced Plaintiffs belief that Welsh and the hospital were trying to euthanize his father.

61. Also during this June 15, 2019 meeting Welsh mocked the Plaintiff's faith by saying "well you're a Christian and you believe in miracles", Plaintiff was so stunned by the comment he does not remember how or if he responded.

62. After the meeting ended, with Plaintiff and a nurse's aid was in the room when R.A. told the nurse's aid "I'm dying anyway but don't kill me". Plaintiff, who was talking to his wife on the phone heard at the time, overheard the comment and asked the nurse's aid "What did he say?" just to be sure. The nurse's aid responded "I'm dying anyway but don't kill me", Plaintiff asked the nurse's aid to document that statement in the medical records.

63. The nurse's aid agreed to document the statement. After the nurse's aid wrote the statement out, Plaintiff asked if he could take a picture of her handwritten note. (Plaintiff took the picture because he no longer trusted the hospital at that point.) The nurse's aid agreed and covered any identifying information with her hands as Plaintiff took a picture of her note quoting R.A.'s statement. (See attached Exhibit A)

64. On Saturday June 15, 2019 at 3:53 p.m. Plaintiff sent the picture of the nurse aid's documentation of his father's statement "I'm dying anyway but don't kill me." to Welsh. In the text message Plaintiff explained to Welsh

> "After you left our father said I'm dying anyway don't kill me. Said it to nurse assistant. I was on the phone with wife I had to ask her what he said."

> (See Exhibit B)

65. Welsh responded at to Plaintiff's text message at 6:30 p.m., she responded by saying "Thanks for the information." (See Exhibit B)

66. Even after receiving direct evidence of R.A.'s wishes, Welsh ignored her statutory duty in Title 63 O.S. Section 3101.16 "... If evidence of the declarant's wishes is sufficient, those wishes shall control" and continued to advocate for treatment that the doctors had admitted would result in R.A.'s death.

67. On Tuesday, June 18, 2019, Plaintiff filed a pleading titled:

"EMERGENCY MOTION TO REMOVE GUARDIAN CATHERINE Z. WELSH
CONTROL GUARDIAN WELSH UNTIL HER REMOVAL
(PROHIBIT REINSTATEMENT OF MORPHINE
INDUCED 'COMFORT CARE MEASURES'
AND REQUEST FOR EVIDENTIARY HEARING

68. A hearing was held on the June 18, 2019 motion that very afternoon. Before the hearing had even began, Judge Glassco tried to protect Welch and/or stop the Plaintiff from testifying by threatening Plaintiff that if he proceeded with the filed request and the hearing that he (Judge Glassco) was going to appoint Plaintiff's step-mother. Plaintiff was undeterred by the threat and testified during the hearing that he would prefer his step-mother be guardian over Welsh, because if someone was going to kill his father he would prefer it be someone that he knows and not someone he father knows, instead of someone that he knows.

69. Plaintiff testified at the hearing regarding Welsh's statements on June 15th and his father's expression of his wishes.  Exhibit A, attached to this complaint, was attached to the June 18th motion and Plaintiff testified about the statement.  At the conclusion of the hearing Judge Glassco's threat proved to be an empty one and Welsh was not removed as his father's guardian.

70. At the June 18th hearing Plaintiff testified and attempted to introduce into evidence a jump drive containing multiple videos of his father showing his father's improved condition and evidence supporting his requested removal of Welsh. Judge Glassco refused to allow the admission of the evidence at the hearing. Plaintiff and his then counsel requested the evidence by introduced into the record as a Court's exhibit and as offer of proof, Judge Glassco  even refused the admission of the evidence as an offer of proof. As a result of Judge Glassco's order Plaintiff was not allowed to make an offer of proof of the evidence that he believed supported his request for Welsh's removal.

13

71. At the June 14th hearing, Welsh was livid that Plaintiff was seeking her removal. After Judge Glassco denied Plaintiff's request for the removal of Welsh, Welsh complained that Plaintiff had posted a picture of his father on Facebook from his hospital bed in an attempt to have people to pray for his father. <u>Welsh then asked Judge Glassco to order Plaintiff to stop asking people to pray for his father on Facebook.</u> Judge Glassco denied that request, <u>but did order Plaintiff not to post any pictures of his father from the hospital on social media</u>.

72. Despite believing that pictures of his father from the hospital would attract more attention and result in more prayers for his father, Plaintiff complied with Judge Glassco's order.

73. Judge Glassco's order that Plaintiff could not post pictures of his father from the hospital was an unconstitutional prior restraint of Plaintiff's First Amendment free speech rights, in exercise of his Christian faith.

74. Welsh's request to Judge Glassco to order Plaintiff to stop posting pictures of his father on Facebook, while asking people to pray for his father, was retaliation for his exercise of his First Amendment Right to free speech in requesting her removal as guardian.

75. Welsh's request that Plaintiff be restrained from asking people to pray for his father on Facebook was a request to impose prior restraints on Plaintiff's free speech rights in the exercise of his Christian faith and her request resulted in an  unconstitutional prior restraint of his free speech rights.

76. Also attending the June 18th hearing was Robyn Owens, who Judge Glassco announced would be appointed as the guardian ad litem for R.A. guardianship case. (The guardian ad litem advises the Court, but actually does not have control over the affairs of the ward.)

77. At the conclusion of the June 14th hearing, Plaintiff's counsel attempted to order a copy of the transcript which Judge Glassco refused to allow unless the other parties to the hearing agreed, Plaintiff was not even allowed to pay for a transcript of the hearing requesting Welsh's removal unless Welsh agreed.

78. Plaintiff was at first relieved to have Owens appointed believing that she would provide some help in stopping Ms. Welsh from euthanizing his father.

79. However, later Plaintiff learned that Owens also believed in euthanasia. Plaintiff learned this during a telephone conversation with Owens when she told Plaintiff that "euthanasia has been going on in this country since the beginning" and that she did not have problem with it. Owens even explained how her and her brother have a euthanasia pact and that her brother even jokes with her sometimes saying "it's time to get into the car Robyn" a reference to putting a dog in the car to be taken to the veterinarian to be put down.

80. During this conversation with Owens, Plaintiff told Owens that he had a problem with euthanasia and she responded by saying "I know because of your faith."

81. Both of the guardians appointed to R.A.'s case by Judge Glassco supported euthanasia. This was never disclosed to the Plaintiff by Judge Glassco when he gave glowing recommendations for them.

82. It is unknown by the Plaintiff if any of the other parties of on R.A.'s guardianship case were aware of the guardian's views on euthanasia.

83. After Plaintiff  attempted to remove Welsh with the June 18, 2019 motion and  with his testimony during the hearing, Welsh continued her campaign of retaliation against the Plaintiff culminating with her intentional <u>misrepresentation</u>  that prepayment was necessary before R.A. could be admitted into the Claremore VA Home that resulted in Plaintiff spending $5,750 that was unnecessary and may not ever be recoverable.

84. Other acts of retaliation (in addition to that already described above) against Plaintiff's exercise of his First Amendment free speech rights include the following:

   a.   Repeated unnecessary delays in arranging R.A.'s transfer from St, John's Hospital to the Claremore Veteran's Hospital.

   b.   Misrepresenting to the guardian ad litem the costs of transporting R.A. to the Claremore Veteran's Home, falsely claiming it would costs $2,000 to $3,000 to transport R.A. to the Claremore Veteran's Home and this would have to be paid upfront, when in fact the transportation was covered by medicare.

   c.   Misrepresenting to the guardian ad litem and others that the Claremore Veteran's Home had still not approved R.A.'s application into their facility when in fact he had been approved for days if not weeks.

   d.   Threatening the St. Johns Hospital if they discharged R.A. in an attempt to keep R.A. in the hospital and out of the Claremore Veteran's Home which she knew was Plaintiff's desire for his father.

e.  By directing the social worker at St. John's Hospital not to speak with Plaintiff about his father, and on information and belief, enlisting or threatening the hospital's legal counsel to ensure St John's social worker would not speak to Plaintiff about his father.

f.  By refusing to give Plaintiff, or his counsel, copies of his father's medical records; despite a Court order that Plaintiff is to be given such records.

g.  By allowing an extended delay in treatment of R.A.'s infection for Clostridium Difficile (C. Diff), which unnecessarily delayed R.A.'s entry into the Claremore Veteran's Home and endangered R.A.'s life.

h.  By attempting to restrict the Plaintiff's request for people to visit his father in the hospital.

i.  By falsely claiming that it would take four (4) to six (6) weeks to get 1099 tax forms for R.A. from the IRS, when in fact the documents were easily obtained with a trip the the IRS office with a certified copy of the proper court paperwork.

j.  Failing to investigate reports of physical abuse of R.A. on June 17th of 2019 at approximately 11:32 am, witnessed by Plaintiff at the St. John's Hospital. Welsh was made aware of during Plaintiff's testimony on June 18, 2019 and in the Plaintiff's pleading filed on June 18, 2019 in an  attempt to have Welsh removed as guardian.

k.  And other items actions unknown to the Plaintiff at the time this action was filed.

85. On August 9, 2019 Plaintiff emailed Owner to see if there was any news. Owens responded in an email saying:

> Nope. I promise I will tell you when I hear something concrete instead of gossip. I am cautiously optimistic I will hear from the VA today.
>
> Robyn

86. Prior to August 13, 2019 Plaintiff spoke to R.A.'s social worker and had learned that St.John's hospital had been ready to discharge R.A. for some time, but was waiting on the Claremore Veteran's Home to approve R.A.'s admission.

87. On August 13, 2019 Plaintiff visited the  Claremore Veteran's Home to inquire for himself what was holding up his father's admission. When he arrived at the Claremore Veteran's Home Plaintiff initially spoke with an employee named Jennifer and then spoke with Kim Smith, the employee handling R.A.'s application. Plaintiff learned that the home had been willing to accept his father for two weeks. Plaintiff sent an email to Owens informing her what he had learned.

88. Also on August 13, 2019 Plaintiff called the hospital social worker for his father and informed her that the Claremore Veteran's Home had been willing to accept his father for days and they were just waiting from word from the hospital.

89. Then on the morning of August 14, 2019 Plaintiff, his brother and sister all received an email from Owens discussing the finances for his father and step-mother and concluding by saying:

> There is no credit for "overpayment" if the amount is later reduced.

My question is "How much can or will Kevin, Craig and Christina contribute each month to the payment of the VA rent if the amount is fixed at $3925?"

Robyn

90. Plaintiff respond to Owens on August 14th with an email that said in part:

I do not practice this area of law but I am told that your authority does not include finances it is only guardianship over the person. In fact Jim McGough[3] told me that as well.

I am told that you are supposed to put the ward's best interest over everyone's best interest. The ward is my father not our stepmother....

......I am told by Kim Smith at the VA, who is working the file that my father could have been moved days ago. I am also told he could be moved, there could be an application for increased benefits and VA pension and we will not have to worry about it until later.

I am told be a retired VA employee and Vet that because my father was "in country" that he can get a residual benefit and may be able to get to 100%. That would make the hospital free. Kim Smith seemed to confirm this is a possibility.

I sent you an email some time ago offering to have this started.....

91. Welsh that was also included in Owens August 14, 2019 email and Plaintiff's

response responded to Plaintiff's response to Owens by saying in part:

....Please stop talking to case management and telling them anything. Refer everyone to Robyn or me. We have told them absolutely no discharge, and they can set a hearing. (Emphasis added)

We are diligently working on this. Judge Glassco is aware of what is going on. (Emphasis added) We spend at least an hour or two a day on this, fielding calls and getting what is needed. Unlike Medicaid, VA does not back pay, so please be patient....

---

[3] While Welsh was primarily responsible for the guardianship of R.A. the firm was actually appointed and Jim McGough, Welsh's partner covered those responsibilities while Welsh was out of town and attended the majority of the hearings on the case.

92. Up until August 14, 2019 Plaintiff had never been told that Welsh and Owens were actually stopping the hospital from discharging his father. Prior to that email Plaintiff had repeatedly been told the Claremore Veteran's Hospital was the reason the transfer had been delayed.

93. Around that time Plaintiff was informed by his father's social worker that she could no longer speak to Plaintiff concerning his father's case.

94. On the morning of August 16, 2019 Plaintiff sent a copy of a letter he left for Dr. Wenger and the patient advocate at St. Johns. In the letter Plaintiff explained how he spoke with a management employee at the Claremore Veteran's Home and the home was ready to receive his father and the hospital was ready the o discharge his father and that they were just waiting for Welsh to approve.

95. Welsh responded to Plaintiff's email on August 16, 2019 and admitted to Plaintiff for the first time that R.A. had finally been approved for admission to VA Home.

96. A hearing in this matter was held on August 16, 2019 without any pleadings being filed requesting the hearing or describing the issues to be addressed.    Once the hearing began, Judge Glassco immediately began talking about cost of the Claremore Veteran's Home, despite the home billing in arrears, his father having enough in retirement , VA benefits and social security to afford the home on his own and the fact that if R.A.'s benefits were increased the home would be no costs to Plaintiff's father. Judge Glassco's questions, without being prompted by anyone at the hearing, were coordinated with Welsh's and Owens objectives in their August 14, 2019 emails.

97. Judge Galssco's knowledge and objectives in his statements confirmed what Owens had stated in her email that "Judge Glassco is aware of what is going on." Despite Plaintiff filing the guardianship originally and being a party, neither he nor his counsel had been informed regarding any *ex parte* communications between Welsh and Judge Glassco.

98. The hearing ended with it being made clear to Plaintiff and his brother that their father would remain in the hospital, the hospital that had almost killed their father two months earlier, until they agreed to pay money as requested by Owens two days earlier.

99. During the hearing Judge Glassco and Welsh had even had a discussion regarding whether or not they could "force" the hospital to keep Plaintiff's father.

100. Also during the hearing Judge Glassco stated what h felt the Plaintiff and his brother should be required to pay.

101. During the hearing Judge Glassco also refused a request by Plaintiff's counsel to order a copy of his father's medical records to be turned over. Welsh had refused a previous request by Plaintiff's counsel to turn over those records despite an order already being in place ordering the records be made available to Plaintiff.

102. Plaintiff alleges that Judge Glassco, Owens and Welsh conspired to deprive Plaintiff of his Due Process Rights by doing the following:

   a.    Plaintiff alleges that Judge Glassco, Owens and Welsh had *ex parte* communication regarding the guardianship of R.A. in Tulsa County case PG-2019-392 without necessity and without informing Plaintiff or his counsel.

21

b.  Plaintiff further alleges Judge Glassco, Owens and Welsh made decisions regarding the guardianship without Plaintiff having notice or opportunity to participate in the decision making process.

c.  Plaintiff further alleges Judge Glassco, Owens and Welsh discussed Plaintiff's actions and made plans and took actions to violate the Plaintiff's First Amendment Rights in his pursuit to have his father moved from the medical facility that almost killed his father.

d.  Plaintiff further alleges Judge Glassco, Owens and Welsh devised a scheme to deprive he Plaintiff of his property by forcing Plaintiff to choose between leaving his father in a facility that had almost killed him or to pay money that if paid unnecessarily could not be recovered.

103. Plaintiff delivered to Welsh, through his counsel a cashier's check in the amount of $5750. Plaintiff also made the hospital's legal counsel aware of the payment. After Plaintiff paid Welsh's demanded amount for the unnecessary pre-payment of fees to the VA Claremore Home, Welsh could no longer stop R.A.'s discharge from St. John's Hospital and admission into the Claremore Veteran's Home.

104. On the morning of Saturday August 17, 2019 Dr. Wenger, another one of the doctors for Plaintiff's father, had a discussion with Plaintiff in front of Plaintiff's father's hospital room. Dr. Wenger told Plaintiff "I just wanted to thank you for not listening to me and keeping the hope for your father." Two (2) months earlier, on June 22nd, Dr. Wenger had tried to convince Plaintiff his father was dying and stated "if your father lives three months it will be miracle."

22

105. After three and one-half (3 1/2) months in St. John's Hospital, much of it unnecessary, on Tuesday, August 20, 2019, R.A. was finally moved to the Claremore VA Home where the staff have expressed amazement at how quickly he is recovering.

106. On August 30, 2019, Plaintiff's wife, youngest daughter and Plaintiff arrived at the Claremore VA Home to visit R.A., Kim Smith an employee of the Claremore Veteran's Home who Plaintiff had spoken with previously about his father's admission into the home was working the front desk. Plaintiff inquired of Ms. Smith about getting a receipt for the money Plaintiff had pre-paid to get his father admitted and was informed that the Claremore Veteran's Home had never required pre-payment to be admitted and the the home "billed in arrears".

107. Since being admitted into the Claremore Veteran's Home R.A. is able to leave his bed in a wheel chair and is able to eat with other residents of the facility. R. A. Is able to navigate the Claremore Veteran's Home with a wheel chair. R.A. is able to go outside in the chair and get fresh air. R.A. is able to spend time with and visit with other residents, including his cousin who is also in the facility. R.A. is now able to move his legs and feet and has started rehab so that he can build his strength and begin walking again. R.A. has an iPhone and is able to talk with friends and family members on the phone. R.A. is looking forward to leaving the facility for Thanksgiving and Christmas and hopes to leave the facility permanently and return home. R.A. is aware that Plaintiff is filing a lawsuit and is supportive of his son's efforts. On September 7, 2019, after being shown a picture of the dress his

granddaughter will wear to the Homecoming asked his son and daughter-in-law to take him to his granddaughter's Homecoming.

## Count One

**Request for Declaratory Judgment under 28 U.S.C. Section 2201 through 2202**

108. Plaintiff incorporates all of the foregoing allegations in each of the paragraphs above as though fully set forth herein.

109. Judge Glassco is a sitting District Court Judge acting under the color of law.

110. Judge Glassco's verbal order to Plaintiff during the June 18, 2019 hearing in the Tulsa County Guardianship case PG-2019-392 directing Plaintiff not to post any pictures of his father from the hospital on social media was an unlawful order that violated Plaintiff's First Amendment right to free exercise of his religion.

111. Plaintiff request a Declaratory Judgement against Defendant Judge Glassco for this count.

## Count Two

**Request for Declaratory Judgment under 28 U.S.C. Section 2201 through 2202**

112. Plaintiff incorporates all of the foregoing allegations in each of the paragraphs above as though fully set forth herein.

113. Judge Glassco is a sitting District Court Judge acting under the color of law.

114. Judge Glassco's verbal order to Plaintiff during the June 18, 2019 hearing in the Tulsa County Guardianship case PG-2019-392 directing Plaintiff not to post any pictures of his father from the hospital on social media was an unlawful order that violated Plaintiff's First Amendment right to free speech.

115. Plaintiff request a Declaratory Judgement against Defendant Judge Glassco for this count.

## Count Three

### Violation of the Oklahoma Religious Freedom Act, Title 51 O.S. Section 251

116. Plaintiff incorporates all of the foregoing allegations in each of the paragraphs above as though fully set forth herein.

117. Judge Glassco substantially burdened Plaintiff's free exercise of his religion while acting under the color of law.

118. Plaintiff request declaratory and monetary judgement against Judge Glasco for this claim, including reasonable costs and attorney fees as provided for by statute.

## Count Four

### Violation of the Oklahoma Religious Freedom Act, Title 51 O.S. Section 251

119. Plaintiff incorporates all of the foregoing allegations in each of the paragraphs above as though fully set forth herein.

120. Welsh substantially burdened Plaintiff's free exercise of his religion while acting under the color of law.

121. Evidence that establishes Welsh was acting under color of law in this case includes but is not limited to the following: [4]

   a.  Glascoe appointed both Welsh and Owens on accord without request.

   b.  Both Welsh and Owens shared similar views on euthanasia

---

[4] See Tower v. Glover, *467 U.S. 914* (1984)

c. On information and belief both Welsh and Owens have been appointed by Glassco multiple occasions

d. On August 14, 2019 Welsh stated in an email that ays in email "Judge Glassco is aware of what is going on."

f. Welsh and Owens sent emails seeking payment of money and Judge Glascoe discussed the same issue at August 16, 2019 hearing without the benefit of a motion being filed raising the issue or any party at the hearing raising the issue.

g. Glassco refused to allow Plaintiff to make record or offer of proof regarding the removal of Welsh, which he personally had recommended and appointed in the past on numerous occasions.

h. Glassco would only allow Plaintiff or his counsel to order transcripts of the hearing seeking the removal of Welsh unless Welsh agreed.

I. Welsh refused medical records despite a court order directing it and Judge Glassco's refusal to order medical records be turned over despite his own previous order.

122. Plaintiff request declaratory and monetary judgement against Welsh for this claim, including reasonable costs and attorney fees.

## **Count Four**

### **Civil Rights/42 U.S.C. §1983; Deprivation of First Amendment Rights**

### **First Amendment Retaliation Claim[5]**

---

[5] *Worrell v. Henry*, 219 F.3d 1197, 1212-13 (10th Cir. 2000).

123. Plaintiff incorporates all of the foregoing allegations in each of the paragraphs above as though fully set forth herein.

124. Welsh was acting under color of state law when she retaliated against Plaintiff.

125. Plaintiff was engaged in clearly established, federally protected rights under the First Amendment of the United States Constitution regarding issues involving both public and private concerns when he filed a motion seeking the removal of Welsh as his father's guardian and testified about statements made to him regarding Welsh's beliefs and euthanasia and his concerns that it would influence her decisions as his father's guardian.

126. Defendant Welsh acting with deliberate, conscious and callous indifference to Plaintiff's First Amendment rights to freedom of speech began a malicious retaliatory campaign, using the power granted to her by Judge Glassco and the Oklahoma Statutes, against Plaintiff that caused him to suffer injuries that would chill a person of ordinary firmness from continuing to exercise Plaintiff's Freedom of Speech.

127. Defendant Welsh's adverse action towards Plaintiff was substantially motivated as a response to Plaintiff's exercise of his constitutionally protected speech.

### Count Five

### Civil Rights/42 U.S.C. §1983; Deprivation of First Amendment Rights

128. Plaintiff incorporates all of the foregoing allegations in each of the paragraphs above as though fully set forth herein.

129. Plaintiff was engaged in clearly established, federally protected free exercise of his Christian faith when he posted pictures of his father on Facebook seeking to generate

prayers for his father. Plaintiff's posts were not only constitutionally protected free speech, but they were also the constitutionally protected acts of Plaintiff's Christian faith.

130. Defendant Welsh was acting under the color of law as described above.

131. Defendant Welsh acting with deliberate, conscious and callous indifference to Plaintiff's First Amendment rights to the free exercise of his Christian faith, and while acting in concert with Judge Glassco, sought and received and order, ordering Plaintiff not to post pictures of his father from the hospital depriving Plaintiff of his right to the free exercise of his Christian faith.

## Count Six

### Civil Rights/42 U.S.C. §1983; Deprivation of First Amendment Rights

132. Plaintiff incorporates all of the foregoing allegations in each of the paragraphs above as though fully set forth herein.

133. Plaintiff was engaged in clearly established, federally protected freedom of speech when he posted pictures of his father on Facebook seeking to generate prayers for his father. Plaintiff's posts were constitutionally protected free speech in the exercise of Plaintiff's Christian faith.

134. Defendant Welsh was acting under the color of law as described above.

135. Defendant Welsh acting with deliberate, conscious and callous indifference to Plaintiff's First Amendment rights to the free speech in the exercise of Plaintiff's Christian faith, and while acting in concert with Judge Glassco, sought and received

and order, ordering Plaintiff not to post pictures of his father from the hospital depriving Plaintiff of his right to <u>free speech</u> in the free exercise of his Christian faith.

## **Count Seven**

### **Civil Rights/42 U.S.C. §1983; Deprivation of Fourteenth Amendment Right to Due Process**

136. Plaintiff incorporates all of the foregoing allegations in each of the paragraphs above as though fully set forth herein.

137. Plaintiff alleges that Defendant Judge Glassco, Defendant Welsh and Owens conspired to deprive Plaintiff of his Due Process Rights guaranteed to him by the Fourteenth Amendment of the United States Constitution by doing the following:

a.    Plaintiff alleges that Judge Glassco, Owens and Welsh had *ex parte* communication regarding the guardianship of R.A. in Tulsa County case PG-2019-392 without necessity and without informing Plaintiff or his counsel.

b.    Plaintiff further alleges Judge Glassco, Owens and Welsh made decisions regarding the guardianship without Plaintiff having notice or opportunity to participate in the decision making process.

c.    Plaintiff further alleges Judge Glassco, Owens and Welsh discussed Plaintiff's actions and made plans and took actions to violate the Plaintiff's First Amendment Rights in his pursuit to have his father moved from the medical facility that almost killed his father.

d.    Plaintiff further alleges Judge Glassco, Owens and Welsh devised a scheme to deprive he Plaintiff of his property by forcing Plaintiff to choose between leaving

his father in a facility that had almost killed his father or to pay money that if paid unnecessarily could not be recovered.

138. Plaintiff request a Declaratory Judgement against Defendant Judge Glassco for this count and monetary damages, attorney fees and costs against Defendant Welsh for this count.

## **Count Eight**
### **Common Law Fraud**

139. Plaintiff incorporates all of the foregoing allegations in each of the paragraphs above as though fully set forth herein.

140. Plaintiff alleges that Defendant Judge Glassco, Defendant Welsh, and Defendant Welsh and McGough, PLLC, along with Owens while acting in concert together committed fraud against Plaintiff by doing the following:

a. Misrepresenting to Plaintiff and his family that it was necessary to pre-pay fees and services before Plaintiff's father could be admitted into the Claremore Veteran's Home. Specifically, their misrepresentations concerning the necessity to pre-pay for pro-rated August and all of September, an amount that totaled almost $6,000.

b. While representing to Plaintiff and his family that the pre-payment of the fees was necessary, much of it in writing via emails, Defendants and Owens knew that it was false.

c. Plaintiff and his family relied upon the Defendants and Owens misrepresentations when Plaintiff unnecessarily paid $5,750 via cashier's check, to Catherine Welsh.

d.  Plaintiff has made repeated request, via email, for a copy of the receipt showing the money was paid  to the Claremore Veteran's Home and and has never been given a copy.

e.  Plaintiff's latest request was sent on September 3rd, "Cathy How is that receipt coming?", Plaintiff's September 3, 2019 email has gone unanswered.

f.  Defendant Judge Glassco acted in concert with other Defendants and conspired with Defendant Welsh and Owens and was acting outside of the scope of his judicial immunity when he committed these acts.

141. Plaintiff request monetary judgements, punitive damages, costs and all other relief the law will allow against Defendant Judge Glassco, Defendant Welsh, Defendant Welsh and McGough, PLLC .

## PRAYER FOR RELIEF

**Wherefore**,   the Plaintiff prays this Court will grant the Plaintiff all the relief the law allows.

Respectfully Submitted,

Kevin D. Adams, OBA# 18914
*Pre Se*
Attorney at Law
36 East Cameron Street, #16
Tulsa, OK 74119
O (918) 582-1313
F (918) 512-4206
C (918) 230-9513
kadams@lawyer.com

# Exhibit A



# Exhibit B

8:22

CW
**Cathy**



After you left our father said I'm dying anyway don't kill me.

Said it to nurse assistant. I was on the phone with wife I had to ask her what he said.

Sat, Jun 15, 6:30 PM

Thanks for the information.

Mon, Jun 17, 7:03 PM

